**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 20-cv-2722-RMR-KAS

BOXER F2, L.P.,

      Plaintiff,

v.

WILLIAM BRONCHICK, individually,
CAROLINE BRONCHICK, individually,
BRONCHICK & ASSOCIATES, P.C., a Colorado professional corporation,
BRONCHICK CONSULTING GROUP, LLC, a Colorado limited liability company,
HASAKI PROPERTY HOLDINGS, LLC, a Delaware limited liability company.

      Defendants.

---

**ORDER**

---

In 2016, Plaintiff Boxer F2, L.P. ("Boxer" or "Plaintiff") obtained two judgments totaling $891,970 against Defendant William Bronchick in a separate case before Chief Judge Brimmer, *Boxer F2, L.P. v. Flamingo West, Ltd.*, 14-cv-0317-PAB-MJW (the "Underlying Lawsuit"). The instant case centers on Plaintiff's attempt to collect that judgment. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff alleges that William Bronchick and his ex-wife, Defendant Caroline Bronchick, devised a scheme to avoid paying the Underlying Lawsuit Judgment. This scheme purportedly involved implementing superficial creditor-debtor relationships between multiple entities owned and operated by William Bronchick, including:

- Bronchick Consulting Group, LLC ("BCG"). BCG is a Colorado limited liability company, and William Bronchick is the sole member of BCG.

- Bronchick & Associates, P.C. ("B&A"). B&A is a Colorado professional corporation, and William Bronchick is the sole shareholder, officer, and director of B&A.

- Hasaki Property Holdings, LLC ("Hasaki"). Hasaki is a Delaware limited liability corporation. William Bronchick and Caroline Bronchick are members of Hasaki.

Plaintiff asserts five claims for relief in this case. The first three causes of action seek a declaratory judgment that Hasaki, BCG, and B&A, respectively, are alter egos of William Bronchick and ask the Court to reverse pierce the corporate veil and hold these entities liable for the judgments entered against William Bronchick in the Underlying Lawsuit. Plaintiff's fourth cause of action seeks the imposition of an equitable lien on all funds that are or come into possession of Hasaki, BCG, or B&A. Finally, Plaintiff's fifth cause of action alleges civil conspiracy against William Bronchick and Caroline Bronchick, who is also a member and manager of Hasaki, for allegedly conspiring to protect William Bronchick from paying the judgment in the Underlying Lawsuit.

The Court presided over a three-day bench trial on July 24–27, 2023. Having carefully considered the evidence presented at trial, the applicable law, and all matters of record, and being fully advised in the premises, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I.     FINDINGS OF FACT

### A.     Stipulated Facts

The parties stipulated to the following facts:

1.     Plaintiff herein, Boxer F2, L.P., was a named plaintiff in a civil action before the United States District Court for the District of Colorado entitled *Boxer F2, L.P., v. Flamingo West, Ltd., et al.*, No. 14-cv-00317-PAB-MJW ("Underlying Lawsuit").

2.     On August 8, 2016, Judge Brimmer entered judgment in the Underlying Lawsuit in Boxer's favor and against William Bronchick in the amount of $720,130.38.

3.     On December 22, 2016, Judge Brimmer entered judgment in the Underlying Lawsuit in Boxer's favor and against William Bronchick (and Flamingo West) in the amount of $171,840.00 for attorney fees (together with the August 8 judgment, the "Underlying Judgments").

4.     William Bronchick appealed the Underlying Judgments to the United States Court of Appeals for the Tenth Circuit, which affirmed the Underlying Judgments.

5.     William Bronchick is a licensed attorney in the State of Colorado, admitted to the Colorado Bar on October 31, 1996.

6.     B&A is a law firm owned and operated by William Bronchick.

7.     B&A is a professional corporation formed under Colorado law.

8.     William Bronchick is the sole shareholder, officer, and director of B&A.

9.     In 2012, B&A's office was located at 3033 S. Parker Road.

10. BCG is a limited liability company formed under Colorado law.

11. BCG is a manager-managed entity.

12. William Bronchick is the sole member of BCG.

13. BCG is a subtenant in B&A's office.

14. Hasaki is a series limited liability company formed under Delaware law.

15. Hasaki is authorized to do business in Colorado as a foreign limited liability company.

16. Per its Operating Agreement, Hasaki is manager-managed.

17. Hasaki is not a member or manager of BCG.

18. Hasaki is not a shareholder, officer, or director of B&A.

19. Hasaki was not a party to the Underlying Lawsuit.

20. The Underlying Judgments remain mostly unsatisfied, though Plaintiff has received, and continues to receive, funds via its writ of garnishment on Mr. Bronchick's income from B&A.

21. The court in the Underlying Lawsuit issued a charging order against William Bronchick's ownership interest in BCG (the "BCG Charging Order"), which was served on BCG on October 24, 2018.

22. On December 13, 2018, the District Court for the District of Delaware in Case No. 1:18-mc-00334-RGA issued a charging order against Mr. Bronchick's membership interest in Hasaki (the "Hasaki Charging Order").

23. Hasaki entered into a Line of Credit agreement with B&A that is dated January 15, 2014.

24.     Hasaki entered into a Line of Credit agreement with BCG that is dated January 15, 2014.

25.     William Bronchick signed the Hasaki/B&A and the Hasaki/BCG line of credit agreements (together, the "LOCs") on behalf of both parties to each agreement.

26.     The sole business of Hasaki has always been to own and manage residential rental properties.

27.     Since its formation in 2013, the two managers of Hasaki have been William Bronchick and Caroline Bronchick. They have equal authority and power to manage the business of Hasaki, per the Hasaki Operating Agreement. (Ex. 9).

28.     If anyone researches the ownership of any of these properties with the county Clerk and Recorder, the name Hasaki will never appear in the public records as being an owner of any of the properties.

29.     In paragraph 12 of Section I.A. of his Order dated June 17, 2016, Judge Brimmer found that, "The last payment that Flamingo West or any other occupant of the Leased Premises made to plaintiff (Boxer) was a payment of $11,546.00 on August 30, 2012."

30.     Prior to the filing of the Complaint in the Underlying Lawsuit, Boxer made written demand to William Bronchick to pay the amounts that were owed on the Lease, and advised William Bronchick that a lawsuit would be filed if payment of the amounts owed was not made. (Ex. 1). The date of this email is October 17, 2012. Prior to receipt of this letter from Boxer, Mr. Bronchick had sent a

letter to Boxer in which he had indicated he was going to abandon the leased premises.

31. Mr. Bronchick knew as of this date, *i.e.*, October 17, 2012, that Boxer intended to file a lawsuit against Flamingo West if the amounts owed on the lease were not paid.

32. Hasaki has never made a demand for payment pursuant to the Hasaki lines of credit and notes.

33. Hasaki has never refused a request from BCG or B&A for a draw on their respective lines of credit.

34. B&A has not paid off the balance that it owes to Hasaki on its line of credit agreement and promissory note because, in the words of Mr. Bronchick, "it doesn't have to at any particular time."

35. Mr. Bronchick further testified that Hasaki sold one of the properties in order to pay attorney fees in this case.

36. The following transactions are reflected in the relevant company records after service of the Hasaki Charging Order:

1. Ex. 3, p. 1874, BCG General Ledger, 4-16-2019, $2,000 listed as a loan from Hasaki
Ex. 8, p. 339, Hasaki General Ledger, 4-16-2019, $2,000 listed as loans to others

2. Ex. 3, p. 1874, BCG General Leger, 4-29-2019, $400 listed as a loan from Hasaki
Ex. 8, p. 339, Hasaki General Ledger, 4-29-2019, $400 listed as loans to others

3. Ex. 3, p. 1876, BCG General Ledger, 6-12-2019, $2,000 listed as loan from Hasaki

Ex. 11, p. 2, Line 96, Hasaki General Ledger, 6-12-2019, $2,000.00 listed as loans to others

4. Ex. 8, p. 339, Hasaki General Ledger, 3-15-2019, $1,000 listed as loan to B&A
   Ex. 34, p. 5, Line 96, B&A General Ledger, 3-15-2019, $1,000.00 listed as legal services

5. Ex. 3, p. 1870, BCG General Ledger, 1-10-2019, $3,000 listed as mentoring income
   Ex. 8, P. 338, Hasaki General Ledger, 1-10-2019, $3,000 listed as loans to others

6. Ex. 3, p. 1870, BCG General Ledger, 1-14-2019, $1,500 listed as mentoring income
   Ex. 8, p. 338, Hasaki General Ledger, 1-14-2019, $1,500 listed as loans to others

7. Ex. 3, p. 1871, BCG General Ledger, 2-12-2019, $2,500 listed as mentoring income
   Ex. 8, p. 338, Hasaki General Ledger, 2-12-2019, $2,500 listed as loans to others

37. According to the BCG General Ledger (Ex. 3), BCG paid a shareholder distribution on November 21, 2018 (approximately one month after the BCG Charging Order was issued and served on BCG) in the amount of $200.

38. There are two occasions where two real estate transactions for properties owned by Hasaki, *i.e.*, 17584 Progress and 3947 S. Truckee, were entered on the Hasaki General Ledger on December 31, 2018, which was over one year after the transactions closed, and then the entries were completely inaccurate. (Ex. 8, Boxer 000355). The Truckee property was sold on September 22, 2017. (Ex. 87, p. 33), and the Progress property sold on April 3, 2017 (Ex. 87, p. 35). As to the Truckee property, the Hasaki General Ledger reflects net sale proceeds of $94,000.01. The Settlement Statement for Truckee (Ex. 122

reflects net sale proceeds of $115,626.30. As to the Progress property, the Hasaki General Ledger reflects net sale proceeds of $108,333.33. (Ex. 8, Boxer 000355) The Settlement Statement for Progress (Ex. 123) reflects net sale proceeds of $99,028.45. Mr. Hartung, CPA for Hasaki, could not explain these discrepancies.

39. There were examples provided at trial of money that left the Hasaki account and never showed up anywhere. One example is $1,000 that the Hasaki General Ledger denoted as a loan to others, *i.e.*, BCG on July 7, 2017. However, the BCG General Ledger does not reflect receipt of those funds. Mr. Bronchick testified that he had no idea where that $1,000 ended up.

40. There were also circumstances in which one transaction was reported three different ways. Exhibit 110 was check #10541 that Hasaki wrote to BCG for a loan for $500. The Hasaki General Ledgers reflects that the purpose of the check was professional fees. Mr. Bronchick stated that this was incorrect. The BCG ledger listed the check as being a shareholder contribution.

41. Ms. Bronchick, as a manager of Hasaki, never authorized Hasaki to personally lend any money to Mr. Bronchick.

42. In the late 1990s, Mr. Bronchick and Ms. Bronchick started the business that would become Hasaki.

43. Hasaki's sole business is the ownership and rental of residential real estate.

44. Ms. Bronchick has been a licensed nurse since 1989 and has no legal training. However, she was involved in physically rehabilitating the properties for rental.

45. Ms. Bronchick also managed the couple's property investments for several years in the 2000s. That included both maintaining the properties as well as the bookkeeping.

46. In 2007, Hasaki turned over physical management of the properties to a property management company called Mavi Property Unlimited, which advertises and shows the properties, collects rent, maintains the properties, generates reports, and deposits the net proceeds into Hasaki's accounts.

47. By around 2012-2013, Ms. Bronchick ceased keeping Hasaki's books.

48. Around December 2013, Mr. Bronchick transferred the portfolio of rental properties (that were held by multiple entities) to Hasaki.

49. Generally speaking, Hasaki's business model is to have Mr. Bronchick purchase a property in his own name, then place the property into a trust with Hasaki as the beneficiary; Hasaki then pays the mortgage, making Hasaki the property's beneficial and/or equitable owner although title remains in the trust.

50. In 2014, the Bronchicks' son was hospitalized for suicidal ideation and required care for years, including counseling, tutoring, and doctor appointments.

51. In 2015, the Bronchicks' daughter also suffered from mental health issues and required similar care.

52. The LOCs each provide for interest at the rate of 4% per annum. (Exs. 4, 66).

53. Hasaki issued various loans to B&A and BCG pursuant to the LOCs.

54. As to all three entities (Hasaki, B&A, BCG), there are many inconsistencies in their accounting records. (Exs. 3, 8, 32, 34).

55.     A licensed certified public accountant named Josh Hartung has prepared Hasaki's tax returns since 2016.

56.     Hasaki has limited corporate records.

57.     Hasaki's members do not have formal meetings; most discussions are brief, informal, and occur at home in the kitchen.

58.     Mr. and Ms. Bronchick separated in 2019 and divorced in 2020.

59.     Ms. Bronchick's handicapped sister occupies one of Hasaki's properties for $500 per month; the property is close to the bus line for transportation to her work and without this arrangement she could not live independently. None of the other tenants in Hasaki's properties are related to the Bronchicks.

60.     In 2017, Hasaki sold two properties (Truckee and Progress), and both transactions predate the Hasaki Charging Order.

61.     Caroline Bronchick owns 41% of Hasaki.

### B.     Additional Findings of Fact

The Court makes the following additional findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1).[1]

62.     Since the service of the charging orders, William Bronchick has not personally taken any money or capital contributions from Hasaki or BCG. Mr. Bronchick

---

[1] Where specific testimony or evidence is cited, the Court finds that evidence was credible and probative as to the Court's findings. This Order does not attempt to address all of the voluminous evidence presented at trial; neither all of evidence supporting the Court's findings is cited herein, nor does the Court attempt to explain or distinguish every piece of contrary evidence. In making the following findings, the Court has carefully considered and weighed all of the available evidence, and the Court's findings also reflect its evaluation of the witnesses' credibility.

testified that he has not taken any draws out of Hasaki since the service of the charging order on Hasaki because he does not want those distributions to be subject to Boxer's charging order. He likewise testified that he has not taken any draws out of BCG since the service of the charging order on BCG because he does not want those distributions to be subject to Boxer's charging order.

63.    According to the BCG General Ledger (Ex. 3), BCG paid a shareholder distribution on November 21, 2018 (approximately one month after the BCG Charging Order was issued and served on BCG) in the amount of $200. As William Bronchick is the only owner of BCG, this distribution was paid to him and appears to be in direct contravention of the BCG Charging Order.

64.    The evidence also establishes that William Bronchick has moved money from Hasaki and BCG into B&A, which is not subject to a charging order.

65.    Pursuant to the LOCs, BCG and B&A were permitted to borrow $400,000 each from Hasaki. Mr. Bronchick testified that he prepared these legal documents on behalf of Hasaki and that other than a change in the names of the borrower, the Hasaki-BCG Line of Credit Agreement and Promissory Note are exactly the same as the Hasaki-B&A Line of Credit Agreement and Promissory Note. There is no security for either of the LOCs, nor is there a default interest rate. Mr. Bronchick conceded that it would be in Hasaki's best interest for the loans

to be secured and for the promissory notes to have a default interest rate. Tr., 7/24/23, 50:6-8, 51:5-7.[2]

66.     Both Line of Credit Agreements provide that the borrower, *i.e.*, BCG or B&A, "agree to furnish to Hasaki upon demand, but not more than-semi-annually, so long as the indebtedness remains unpaid, a certified financial statement provided by an independent accountant setting forth in reasonable detail the assets, liabilities, and net worth of the borrower certified to under oath by an officer of the borrower." Hasaki has never demanded any financial statement from either BCG or B&A. Tr.*,* 7/24/23, 57:26-58:2.

67.     Mr. Bronchick, as a manager of Hasaki, has never kept a running total of how much interest is owed on the BCG or B&A demand notes. Tr.*,* 7/24/23, 103:13-16. B&A has never provided a certified financial statement to Hasaki in accordance with paragraph 4 of the Hasaki/B&A Line of Credit Agreement. No demand for payment has ever been made by Hasaki per the promissory note.

68.     There are no minutes, corporate resolutions, or actions by consent of Hasaki that mention either of the two Line of Credit Agreements that Hasaki entered into with B&A and BCG. There are likewise no minutes for either B&A or BCG that authorize or reference the agreements.

69.     Even after the service of the Charging Order on Hasaki, Hasaki as the lender and BCG and B&A as the borrowers engaged in numerous separate loan

---

[2] Citations to "Tr." refer to the trial transcript, docketed in multiple parts. *See* ECF No. 91 (July 24, 2023), ECF No. 92 (July 25, 2023), and ECF No. 93 (July 26, 2023).

transactions, several of which are inconsistently and ambiguously recorded in the companies' general ledgers.

70.     With respect to the many loans purportedly made by Hasaki that are listed on the Hasaki General Ledger (Ex. 11), there is no way to know who the borrower was, what the terms of the loan are, how much was borrowed, or the interest rate charged. Further, not one of these loans was evidenced by a promissory note.

71.     Additional examples of inaccurate, incomplete, and/or misleading entries in the Hasaki books include:

(i)  Exhibit 11, the Hasaki General Ledger, includes an entry for "loan to others" at line 192. This reflected that someone was repaying Hasaki $500 on a loan. Mr. Bronchick admitted that there was no way to know to whom this loan was made. Tr*., 7/24/23, 108:18 – 109:1.

(ii) Exhibit 8, the Hasaki General Ledger, reflects a check written for $700 to Universal Properties, which is an LLC owned by some of Mr. Bronchick's IRA's. Tr*., 7/24/23, 111:13-20.

72.     The evidence also revealed numerous Hasaki transactions for which Mr. Bronchick could not offer an explanation and the recipient of outgoing funds is unclear. One example is $1,000 that the Hasaki General Ledger denoted as a loan to others, *i.e.*, BCG, on July 7, 2017. However, the BCG General Ledger does not reflect receipt of those funds. Mr. Bronchick testified that he had no idea where that $1,000 ended up. Tr*., 7/24/23, 125:2-14. Another example

involving a larger amount of money that left the Hasaki account and could not be traced is a $10,000 entry on the Hasaki General Ledger denoted as a loan to others, *i.e.*, BCG, on September 22, 2017. However, the BCG General Ledger does not reflect receipt of those funds. Tr.*, 7/24/23, 124:4-24.

73.  There were also numerous examples of one of Mr. Bronchick's entities transferring small amounts of money to another in order to bring the receiving company out of a negative financial status in its bank account. Tr.*, 7/24/23, 126:14-128:3 (transfer of funds from B&A to BCG); *id*. at 131:20-132:4 (transfer of funds from B&A to BCG). Mr. Bronchick admitted that Hasaki incurred NSF charges on 37 separate occasions during the period January 14, 2020, through November 14, 2020, totaling almost $1,300. Tr.*, 7/24/23, 135:7-137:21.

74.  A lack of books and records also exists in regard to services that BCG supposedly provided to B&A. Mr. Bronchick admitted under cross examination that there were no invoices prepared by BCG that were submitted to B&A for payment. Tr.*, 7/24/23, 129:15-23.

75.  There were also circumstances in which one transaction was reported three different ways. For example, Exhibit 110 was a check #10541 that Hasaki wrote to BCG for a loan for $500. The Hasaki General Ledgers reflects that the purpose of the check was professional fees. Mr. Bronchick admitted that this was incorrect. The BCG ledger listed the check as being a shareholder contribution. Tr., 7/24/23, 138:11-139:22.

76.     William Bronchick and Caroline Bronchick offered contradictory testimony regarding the development of the two Line of Credit Agreements and the approval of the loans that Hasaki made to BCG and B&A. Specifically, Mr. Bronchick testified:

   a.   He made Caroline Bronchick aware of almost all the loans that were being made at the time the loans were actually being funded. Tr., 7/24/23, 59:21-24.

   b.   Every time a check was written by Hasaki to BCG, he first consulted with Caroline Bronchick as a co-manager of Hasaki. Tr., 7/24/23, 59:25-60:3.

   c.   Every time a check was written by Hasaki to B&A, he first consulted with Caroline Bronchick as a co-manager of Hasaki. Tr., 7/24/23, 60:4-7.

   d.   Caroline Bronchick approved all of the loans from Hasaki to B&A and BCG. Tr., 7/24/23, 60:8-10.

   e.   He discussed with Caroline Bronchick distributions that were made from Hasaki at or about the time each of those distributions were made, and she approved of all of these. Tr., 7/24/23, 61:10-18.

To the contrary, Ms. Bronchick testified:

   a.   The first time that she saw the Hasaki/B&A line of credit agreement was at her deposition. Tr., 7/25/23, 337:18-21.

b.   She did not recall ever having a discussion with Mr. Bronchick regarding what the terms of the LOCs were. Tr*., 7/25/23*, 337: 21-25.

c.   She did not approve the LOCs between Hasaki on the one hand and BCG and B&A on the other hand. Tr*., 7/25/23*, 338:2-6.

d.   She was aware that Mr. Bronchick testified at trial that she knew and approved of all of the loans made by Hasaki per the LOCs. She testified that she did not agree that she knew of every single transaction. Tr*., 7/25/23*, 338:21-339:1.

e.   When Mr. Bronchick explained to Ms. Bronchick his desire to place title to the properties that he had purchased in his own name into trusts, he "explained to me in a very basic way about asset protection, how it protects us against the tenants from knowing where we live. . . . I'm not sure he used the word 'protection against creditors.' My concern was about asset protection and anonymity for family reasons." Tr*., 7/25/23*, 341:19-342:19.

f.   Until her deposition was taken in this lawsuit, Ms. Bronchick did not know what the charging order against Mr. Bronchick's membership interest in Hasaki meant Tr*., 7/25/23*, 354:5-11. The Court finds that Mr. Bronchick's withholding of this information from Ms. Bronchick is significant and reflects a lack of credibility on the part of Mr. Bronchick.

g.    Until her deposition was taken in this lawsuit, Ms. Bronchick did not know that Mr. Bronchick, through Hasaki, had lent Mr. Bronchick's sister, Eileen Bronchick, $5,000. Tr*., 7/25/23*, 357:11-24. The Court finds that Mr. Bronchick's withholding of this information from Ms. Bronchick is significant and reflects a lack of credibility on the part of Mr. Bronchick.

h.    As noted in this Order, Hasaki lent money to Mr. Bronchick personally. Ms. Bronchick, as a manager of Hasaki, never authorized Hasaki to personally lend any money to Mr. Bronchick Tr*., 7/25/23*, 359:6-11. The Court finds that Mr. Bronchick's personally borrowing money from Hasaki without obtaining the consent of Ms. Bronchick, the other manager of Hasaki, is significant and reflects a lack of credibility on the part of Mr. Bronchick.

77.    The evidence at trial also revealed numerous uses of the companies' funds for noncorporate or otherwise improper purposes.

78.    Mr. Bronchick wrote a check for $50,000 from Hasaki to B&A. The memo line on the check states, "Capital distribution to C. Bronchick." Mr. Bronchick admitted that Caroline Bronchick is not an officer, director, or shareholder of B&A. The check was deposited into Mr. Bronchick's law firm's trust account. Mr. Bronchick admitted that if Mr. Bronchick was actually receiving a distribution from Hasaki, the proper way to have handled this would be for Hasaki to write a check directly to Caroline Bronchick. Mr. Bronchick admitted

that this manner of handling the $50,000 "was probably not the brightest way to do it." Tr*., 7/24/23, 113:16-115:20.

79.    The BCG General Ledger lists an entry on June 18, 2018, that reads, "Deposit, Bronchick & Associates from account 2036." The account is Mr. Bronchick's COLTAF account. Mr. Bronchick admitted that BCG could not be making any shareholder contributions out of his law firm's COLTAF account. Tr., 7/24/23, 142:23–143:18.

80.    B&A also received payments from Hasaki that were described as distributions to William Bronchick's family members, who are not shareholders of B&A. On one occasion, Mr. Bronchick wrote a check from Hasaki to B&A, with the memo line on the check reading, "Phyl Rock, WB Distribution." PhylRock is a reference to William Bronchick's mother, Phyllis Rockower, who was never entitled to any distribution from Hasaki and who is not a shareholder of B&A.

81.    Mr. Bronchick testified that he directed Hasaki to pay at least $35,000 in legal fees to the law firm of Silver & DeBoskey for legal services rendered to Mr. Bronchick personally. These legal fees were paid by Hasaki for Mr. Bronchick's appeal of the Underlying Lawsuit. Mr. Bronchick admitted that Hasaki was not a party to that appeal and Hasaki was not appealing the judgments that were entered in the Underlying Lawsuit. Tr*., 7/24/23, 121:9-25.

## II.    CONCLUSIONS OF LAW

Where a federal court hears a case pursuant to its diversity jurisdiction, it applies the substantive law of the forum state. *Barrett v. Talon*, 30 F.3d 1296, 1300 (10th Cir.

1994). In prior phases of this litigation, the parties have at times inconsistently argued as to whether Colorado or Delaware law should govern certain claims. For the sake of uniformity under the law of the case doctrine, the Court will continue to apply Colorado law, consistent with its Order on Defendants' motion for summary judgment and the positions taken by the parties at that time.

### A.    Reverse Veil-Piercing/Alter Ego Liability

In its first three causes of action, Plaintiff seeks declaratory judgment that Hasaki, BCG, and B&A are each the respective alter egos of William Bronchick. Plaintiff therefore asks the Court to reverse pierce the corporate veil and find these entities liable for the judgments entered against Mr. Bronchick in the Underlying Lawsuit.

To prevent abuse, Colorado law permits trial courts to disregard the corporate form and pierce the corporate veil when a corporation and a shareholder are alter egos of each other. *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006). Reverse piercing occurs when a claimant seeks to hold a corporation liable for the obligations of an individual shareholder. *Id.* A court may reverse pierce the corporate veil and obtain the assets of a corporation for the obligations of a controlling shareholder or other corporate insider only upon a clear showing that (1) the controlling insider and the corporation are alter egos of each other; (2) justice requires recognizing the substance of the relationship over the form because the corporate fiction is utilized to perpetuate a fraud or defeat a rightful claim; and (3) an equitable result is achieved by piercing. *Id.* at 644, 646. "A claimant seeking to pierce the corporate veil must make a clear and convincing showing that each consideration has

been met." *Id*. at 644. Piercing the corporate veil is justified only in extraordinary circumstances, and the paramount goal is to achieve an equitable result. *Id*.

First, the Court must determine whether the corporate entity is the "alter ego" of the person or entity in issue. *Id*. Under Colorado law, "[a]n alter ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'" *Id*. (quoting *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004)). To determine alter ego status, courts consider a number of factors, including whether: (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes. *Id.* at 644. "These factors reflect the underlying principle that the court should only pierce when the corporate form has been abused." *Id.* The inquiry looks to the specific factors of each case, and not all of the listed factors need be shown in order to establish alter ego status. *See Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

The second prong of the veil piercing inquiry looks to whether justice requires recognizing the substance of the relationship over the form of the relationship because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim." *Phillips*, 139 P.3d at 644; *Reader v. Dertina & Assocs. Mktg., Inc.*, 693 P.2d 398, 399 (Colo. App.

1984) (veil piercing applies "where the corporate entity has been used to defeat public convenience, or to justify or protect wrong, fraud, or crime, or in other similar situations where equity requires").

The final prong of the veil piercing inquiry considers "whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder personally liable for the acts of the business entity." *Phillips*, 139 P.3d at 644 (citing *Water, Waste & Land, Inc.*, v. Lanham, 955 P.2d 997, 1004 (Colo. 1998)); *see also Great Neck*, 37 P.3d at 490 ("Piercing the corporate veil is an equitable remedy, requiring balancing of the equities in each particular case."). "A claimant seeking to pierce the corporate veil must make a clear and convincing showing that each consideration has been met." *Phillips*, 139 P.3d at 644.

### 1.    Alter Ego Factors

The Court finds that Boxer has demonstrated the following alter ego factors from *Phillips* with regard to Hasaki, BCG, and B&A:

<u>Commingling of funds and other assets</u>. Hasaki, BCG, and B&A move money back and forth regularly and on an as-needed basis. These transactions were not conducted at arms' length. Hasaki made up to $800,000 available to BCG and B&A through the LOCs, which are unsecured and have no provision for default interest or a stated maturity date.  Hasaki has neither charged nor collected interest on these loans, and Mr. Bronchick admitted that he does not keep track of how much interest BCG and B&A owe on the demand notes. Hasaki has never made a demand for payment pursuant to the LOCs, and the respective balances owed by BCG and B&A to Hasaki remain largely unpaid.

Further, while B&A and BCG ostensibly were involved in different businesses, their operations blended into each other. They operated out of the same office, and money was transferred between the companies without documentation and for no apparent valid business purpose. Services were supposedly provided by BCG to B&A for a fee, but no invoices were ever generated, and no basis for how these fees were determined was presented to the Court. The Court finds that Boxer has presented clear and convincing evidence of Mr. Bronchick, Hasaki, BCG, and B&A commingling assets.

Inadequate corporate records. No records have been kept by Hasaki of amounts that BCG and B&A owe to Hasaki under the LOCs. Few if any company minutes or resolutions exist for any of the entities, and no income statements or balance sheets were produced for Hasaki, BCG, or B&A. Additionally, the accounting records for Hasaki, BCG, and B&A conflict with each other and with other documents. They contain ample false and inaccurate entries and unaccounted-for payments. On numerous occasions, checks written from one entity to another do not appear in the records of the purported receiving entity or are recorded in the respective entities' ledgers in entirely different ways. Mr. Bronchick's testimony that the inconsistencies between the entities' ledgers were largely the result of differences in the ways that each entity's bookkeeper booked and characterized intercompany transactions, a lack of formal accounting training, and/or possible software glitches is not credible. The Court finds that Boxer has clearly and convincingly established that adequate corporate records were not maintained for Hasaki, BCG, or B&A.

The nature and form of the entity's ownership and control facilitate misuse by an insider. The evidence further establishes that the nature and form of Hasaki, BCG, and B&A's ownership and control facilitated misuse by an insider. Although William and Caroline Bronchick are co-managers of Hasaki with equal power, rights, and authority, the evidence is clear that Mr. Bronchick dominated Hasaki. Indeed, Mr. Bronchick does not dispute that Ms. Bronchick did not pay attention to and was largely unaware of Hasaki's affairs and trusted Mr. Bronchick to manage the business himself.  Mr. Bronchick unilaterally made decisions regarding Hasaki's operations and effectuated transfers of funds from Hasaki's accounts to BCG, B&A, and other individuals such as his sister, his mother, and himself on the terms and timeline of his choosing. Mr. Bronchick is the sole principal of BCG and B&A and has sole decision-making authority for both companies. He prepared the Hasaki/BCG and Hasaki/B&A LOCs and executed them on behalf of all three companies. The Court finds that Mr. Bronchick effectively exercised complete control over all three companies and that his control did in fact facilitate misuse of the corporate form.

Thin capitalization. The Court additionally finds that the record contains evidence that Hasaki, BCG, and B&A were undercapitalized, including testimony and bank records indicating that the entities kept less than one week of cash on hand, as well as BCG and B&A at times having negative bank balances, and all three entities incurring significant NSF fees.

Disregard of legal formalities. Among other things, there are few company minutes, invoicing between the companies does not take place, and money is lent back and forth

without documentation, definite terms, or security. Which company owes the other money is not documented in any meaningful manner. The record amply supports a finding that Mr. Bronchick ignored legal formalities regarding Hasaki, BCG, and B&A.

Use of corporate funds or assets for noncorporate purposes. Mr. Bronchick has routinely diverted funds from Hasaki, BCG, and B&A to noncorporate purposes. From 2016 to 2019, Hasaki loaned over $280,000 to BCG and $98,000 to B&A. Mr. Bronchick wrote checks from Hasaki's bank account to pay his own personal legal bills in the underlying proceedings totaling over $32,000. B&A also received payments from Hasaki which were described as distributions to William Bronchick's family members, who are not shareholders of B&A. The evidence also indicates that B&A's COLTAF account was used improperly to move money between Hasaki, BCG, and B&A. The Court finds that Plaintiff has clearly and convincingly shown that Mr. Bronchick used corporate funds for noncorporate purposes, including personal expenses, and effectively treated the assets of all three entities interchangeably.

Based upon the foregoing, the Court finds that Boxer has satisfied the burden of establishing that the first prong of the veil-piercing inquiry is met with regard to each of Hasaki, BCG, and B&A. However, to pierce the corporate veil and impose liability on any of the entities, Boxer must also establish that Mr. Bronchick used the entity's corporate form— and its veil of limited liability—to perpetrate a wrong against Boxer.

### 2. Whether the Corporate Form was Used to Perpetrate a Wrong

The second prong of the veil-piercing inquiry reflects a recognition that the corporate veil may be pierced "[o]nly when the corporate form was used to shield a

dominant shareholder's improprieties." *McCallum*, 221 P.3d at 78 (quoting *Phillips*, 139 P.3d at 644). The mere fact that corporate creditors would go unsatisfied because they cannot reach a shareholder's personal assets does not, by itself, justify piercing the corporate veil. *Id*. Only when the corporate form is used to shield a dominant shareholder's improprieties may the veil be pierced. *Phillips*, 139 P.3d at 641. To satisfy the second prong of the veil-piercing test, a plaintiff may show either fraud or that the corporate form was abused to defeat the rightful claims of creditors. *McCallum*, 221 P.3d at 78.

While the Court does not find that Hasaki, BCG, or B&A were created for an improper purpose, the Court finds that the corporate fiction of these entities was ultimately abused in a manner that served to defeat Boxer's rightful claim as a creditor of Mr. Bronchick. Mr. Bronchick disregarded virtually all corporate formalities with respect to the flow of money between Hasaki, BCG, and B&A, effectively treating the assets of each entity interchangeably. Mr. Bronchick acknowledged that he has not taken any draws from Hasaki or BCG since service of the respective charging orders because he does not want those distributions to be subject to Boxer's charging orders. Mr. Bronchick argues that the LOCs were put in place two years before the Underlying Judgments entered against Flamingo West and Mr. Bronchick and were not created to evade potential future collection by Plaintiff. But whether or not the LOCs were *designed* to provide Mr. Bronchick with a method to transfer money between Hasaki and his other companies, Mr. Bronchick has in fact used them in that manner. The evidence establishes that Mr. Bronchick's actions effectively placed what should have been corporate funds out of

Boxer's reach, thereby defeating its rightful claim. Accordingly, the Court finds that the second veil-piercing prong is satisfied with respect to all three entities.

### 3.    Equitable Result from Piercing the Veil of Limited Liability

Veil piercing is appropriate only if it will generate an equitable result. *Phillips*, 130 P.3d at 644. "When innocent shareholders or creditors would be prejudiced by outside reverse piercing, an equitable result is not achieved. *Id*. at 646. "[E]quity requires that innocent shareholders and creditors be adequately protected before outside reverse piercing is appropriate under Colorado law." *Id*.; *see also Floyd v. I.R.S. U.S.*, 151 F.3d 1295, 1299 (10th Cir. 1998) ("[T]he doctrine cannot be applied to prejudice the rights of an innocent third party.") (quotation omitted).

<u>Hasaki (Claim One)</u>

Notwithstanding the satisfaction of the first two veil-piercing prongs, the Court does not find that the equities of the situation merit veil piercing with respect to Hasaki in light of Ms. Bronchick's status as an innocent member of Hasaki. "Innocent shareholders possess legitimate expectations that corporate assets will be insulated from the claims of a controlling insider's creditors." *Phillips*, 130 P.3d at 644.

Neither Ms. Bronchick nor Hasaki were parties to the Underlying Lawsuit or the lease giving rise to that lawsuit. Ms. Bronchick had limited, secondhand information about Mr. Bronchick's dealings with Plaintiff and the Underlying Judgments. She testified credibly that for years she was unaware of the Underlying Judgment amount and thought it was somewhere around $200,000 or $300,000. Moreover, Ms. Bronchick was not represented by counsel in her divorce from Mr. Bronchick. She received no

documentation regarding the finances of Mr. Bronchick's businesses or the Underlying Judgments and was unaware of any rights she may have had to separate her interest in Hasaki from Mr. Bronchick's. Indeed, Ms. Bronchick received a greater interest in Hasaki as part of the parties' divorce proceedings. The Court finds credible Ms. Bronchick's testimony that she took no steps to assist Mr. Bronchick in evading or frustrating Plaintiff's collection efforts, and the Court finds no evidence establishing otherwise. The Court thus finds that Ms. Bronchick is an innocent member of Hasaki and its largest single member. For these reasons, the Court cannot conclude that an equitable result will be achieved by holding Hasaki liable for Mr. Bronchick's obligations in this action.

Plaintiff's First Claim for Relief for Declaratory Judgement against Hasaki is therefore DENIED.

<u>Bronchick & Associates (Claim Three)</u>

The Court likewise finds that equitable considerations ultimately preclude veil-piercing with respect to B&A. Mr. Bronchick testified that B&A is an active law practice focused on the areas of real estate and asset protection with approximately 300 current clients. The Court finds Mr. Bronchick's testimony credible on this point, and Plaintiff did not introduce any evidence to the contrary. The record indicates that B&A's clients are innocent stakeholders who would likely be harmed by piercing B&A's corporate veil. Accordingly, the Court finds that Plaintiff has not carried its burden to show by clear and convincing evidence that this is one of the "extraordinary" circumstances in which equity dictates that the Court disregard the corporate form and impose alter ego liability as to B&A.

Plaintiff's Third Claim for Relief for Declaratory Judgement against B&A is therefore DENIED.

<u>Bronchick Consulting Group (Claim Two)</u>

Balancing the equities yields a different result with respect to BCG. Unlike Hasaki and B&A, Defendants have not identified any actual innocent stakeholders or creditors of BCG that would be harmed by piercing the veil of BCG.

Boxer has demonstrated by clear and convincing evidence that William Bronchick and BCG are alter egos of each other and that justice requires recognizing the substance of that relationship over the form to achieve an equitable result. Accordingly, the Court finds that reverse piercing of the corporate veil as to BCG is appropriate.

**B.    Equitable Lien**

Plaintiff's fourth cause of action seeks the imposition of an equitable lien on all funds that are or come into possession of Hasaki, BCG, or B&A. An equitable lien may be "declared by a court of equity out of general considerations of justice as applied to the relations of the parties and the circumstances of their dealings." *Fort Lupton State Bank v. Murata*, 626 P.2d 757, 759 (Colo. App. 1981). "The discretion of a court in equity in declaring that an equitable lien exists is not unbounded, however, since the purpose of the lien is to prevent unjust enrichment." *Leyden v. Citicorp Indus. Bank*, 782 P.2d 6, 9 (Colo. 1989). "An equitable lien that is imposed by a court of equity to prevent unjust enrichment is a special form of constructive trust." *Id.* (citation omitted).

To prevail on a claim of unjust enrichment, a claimant must show that (1) it conferred a benefit upon the defendant; (2) the benefit was appreciated by the defendant;

and (3) the benefit was accepted by the defendant under circumstances that would render it inequitable for the benefit to be retained without payment of its value. *DBC Const. Co., Inc. v. Central City Development C*o., 965 P.2d 115, 119 (Colo. 1998).

The Court finds that the same equitable considerations that discourage piercing the corporate veil with respect to Hasaki and B&A also militate against imposition of an equitable lien. Just as innocent shareholders or creditors would be prejudiced by outside reverse piercing, so too would they seemingly be prejudiced by an equitable lien against the entities' property. Plaintiff cites no authority establishing that an equitable lien is an appropriate remedy under these circumstances, and the Court is aware of none.[3] Further, having found that Plaintiff may recover from BCG under an alter ego theory of liability, the Court perceives no basis for imposing an equitable lien on BCG's funds or assets—and, again, Plaintiff offers none.

Accordingly, Plaintiff fails to establish that it is entitled to an equitable lien against Hasaki, BCG, or B&A. Plaintiff's Fourth Claim for Relief is DENIED.

---

[3] To the contrary, it appears that any claim for an equitable lien against the assets of Hasaki is foreclosed by Delaware law, which governs the Hasaki Charging Order. *See* 6 Del.C. § 18-703(e) ("No creditor of a member or of a member's assignee shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company."); *see also Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (quoting 6 Del. C. § 18-703(e)) ("[I]f a judgment creditor seeks to bypass its charging order to enforce its judgment through 'other legal or equitable remedies,' that action is barred by statute and must be dismissed."). Therefore, Plaintiff cannot use equity to circumvent the Hasaki Charging Order.

### C.      Civil Conspiracy

To state a claim for civil conspiracy under Colorado law, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). Based on the record taken as a whole, the Court finds that the elements needed to prove civil conspiracy have not been satisfied in this case.

The Court is not persuaded from the evidence presented that Ms. Bronchick took any steps to assist Mr. Bronchick in evading Plaintiff's collection efforts, nor that Ms. Bronchick was complicit in the use of Hasaki for any improper purpose, such that Plaintiff's claim for civil conspiracy can be sustained. Ms. Bronchick testified that she was largely unaware of Hasaki's affairs and trusted Mr. Bronchick to manage the business appropriately. She further testified that beginning in 2012–13, she had minimal involvement in Hasaki's business after returning to work as a full-time nurse and caring for her husband's and children's mental health issues. With respect to the judgments obtained by Plaintiff against Mr. Bronchick in the underlying lawsuit and the charging order subsequently issued against his ownership interest in Hasaki, Ms. Bronchick testified that she "was floored" to learn from the sworn financial statement prepared by Mr. Bronchick in their 2019 divorce proceedings that Plaintiff's judgment exceeded $700,000—having previously believed the amount to be closer to $200,000 to $300,000. Ms. Bronchick further attested that prior to her deposition in the current case, she neither

knew what a charging order was nor that Plaintiff had obtained a charging order against Mr. Bronchick's interest in Hasaki.

The Court finds credible Ms. Bronchick's testimony that she had only limited information about Mr. Bronchick's dealings with Plaintiff, including the entry of the judgments against him, and finds that she did not knowingly or intentionally take steps to assist Mr. Bronchick in evading or frustrating Plaintiff's collection efforts. Consequently, the evidence does not support a finding that William Bronchick and Caroline Bronchick had a "meeting of the minds" on any aim to prevent Plaintiff from satisfying its judgments against Mr. Bronchick or impede its collection efforts. Because Plaintiff has failed to carry its burden of proof with respect to at least one element of its civil conspiracy claim, the claim necessarily fails, and the Court need not analyze the remaining elements.

Plaintiff's Fifth Claim for Relief for civil conspiracy is therefore DENIED.

### III.   CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's First, Third, Fourth, and Fifth Claims for Relief;

2.   As to Plaintiff's Second Claim for Relief, the Court enters the following declaration:

   (a)   William Bronchick and Bronchick Consulting Group, LLC are alter *egos* of each other;

   (b)   Justice requires recognizing the substance of the relationship over the form; and

   (c)   It is appropriate to reverse pierce the corporate veil, and to hold Bronchick Consulting Group, LLC liable for the judgments entered against William Bronchick in the Underlying Lawsuit.

3.    The Judgments that were entered in the Underlying Lawsuit, *Boxer F2, L.P., v. Flamingo West, Ltd., et al.*, No. 14-cv-00317-PAB-MJW, shall be entered as judgments in favor of Plaintiff and against Defendant Bronchick Consulting Group, LLC; and

4.    The Clerk of Court is directed to enter Final Judgment in this matter in accordance with this Order.

DATED:  March 15, 2024

BY THE COURT:

REGINA M. RODRIGUEZ
United States District Judge